UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

ELSIE A. HARLOW,

        Plaintiff,

v.                                Case No.  5:07-cv-399-Oc-GRJ

MICHAEL J. ASTRUE, Commissioner of Social
Security,

        Defendant.

_____

## ORDER

Plaintiff appeals from a final decision of the Commissioner of Social Security ("the Commissioner") denying her applications for a period of disability, and disability insurance benefits. (Doc. 1.) The Commissioner has answered (Doc. 14), and both parties have filed briefs outlining their respective positions. (Docs. 20 & 21.) For the reasons discussed below, the Commissioner's decision is due to be **REVERSED** and **REMANDED** under sentence four of 42 U.S.C. §405(g).

## I.  PROCEDURAL HISTORY

On November 27, 1995, Plaintiff filed applications for a period of disability and disability insurance benefits, alleging a disability onset date of November 15, 1992. (R. 70-72.) Plaintiff's application was denied initially and upon reconsideration. (R. 73-78, 158-61.) Thereafter, Plaintiff timely pursued her administrative remedies available before the Commissioner and requested a hearing before an Administrative Law Judge ("ALJ"). (R. 34, 79.) The ALJ conducted Plaintiff's administrative hearing on July 10, 1997. (R. 16, 36-68.) The ALJ issued a decision partially unfavorable to Plaintiff on

August 25, 1997. (R. 9-21.) Plaintiff's request for review of the hearing decision by the Social Security Administration's Office of Hearings and Appeals was denied. (R. 6-7.) Plaintiff thereafter appealed to this Court and the matter was reversed and remanded for further proceedings on July 21, 2000.[1] On August 11, 2000, the Appeals Council vacated the prior hearing decision and remanded the matter to an ALJ for further proceedings. (463-64.)

The ALJ conducted a supplemental administrative hearing on May 14, 2001. (R. 566-620.) The ALJ issued a decision denying Plaintiff's application in its entirety on July 24, 2001. (R. 530-38.) Plaintiff's request for review of the hearing decision by the Social Security Administration's Office of Hearings and Appeals was granted and the Appeals Council subsequently remanded the matter back to the ALJ for further development and consideration. (R. 539, 541-43.)

On remand, and pursuant to the Appeals Council's instructions, the ALJ conducted another hearing on April 20, 2004. (R. 621-63.) The ALJ issued a decision partially unfavorable to Plaintiff on August 26, 2004. (R. 393-401.) Plaintiff's subsequent request for review of the hearing decision by the Social Security Administration's Office of Hearings and Appeals was denied. (R. 382-85.) Plaintiff then filed the instant appeal with this Court. (Doc. 1.)

## II. <u>STANDARD OF REVIEW</u>

The Commissioner's findings of fact are conclusive if supported by substantial

---

[1] (R. 418-19.) See <u>Harlow v. Apfel</u>, No. 5:99-cv-64-Oc-TJC (M.D. Fla. July 21, 2000).

evidence.[2] Substantial evidence is more than a scintilla in that the evidence must do more than merely "create a suspicion of the existence of [a] fact," and must include "such relevant evidence as a reasonable person would accept as adequate to support the conclusion."[3]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[4] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[5] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[6] The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than

---

[2] *See* 42 U.S.C. § 405(g).

[3] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Richardson v. Perales, 402 U.S. 389, 401(1971); Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982)); *accord* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[4] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[5] Foote, 67 F.3d at 1560; *accord* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding court must scrutinize entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding court must also consider evidence detracting from evidence on which Commissioner relied).

[6] Keeton v. Dep't Health & Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

twelve months.[7] The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[8]

The ALJ must follow five steps in evaluating a claim of disability.[9] First, if a claimant is working at a substantial gainful activity, she is not disabled.[10] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[11] Third, if a claimant's impairments meet or equal an impairment listed in Title 20, Part 404, Subpart P, Appendix 1 of the Code of Federal Regulations, she is disabled.[12] Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.[13] Fifth, if a claimant's impairments (considering her residual functional capacity ("RFC"), age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[14]

---

[7] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[8] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-.1511.

[9] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *See* Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[10] 20 C.F.R. § 404.1520(b).

[11] Id. § 404.1520(c).

[12] Id. § 404.1520(d).

[13] Id. § 404.1520(e).

[14] Id. § 404.1520(f).

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[15] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[16] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[17]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[18] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[19]

The ALJ may use the grids as a framework to evaluate vocational factors so long as the ALJ introduces independent evidence of the existence of jobs in the national

---

[15] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); *see also* Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[16] Doughty, 245 F.3d at 1278 n.2.
In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.
Id. (internal citations omitted).

[17] Walker, 826 F.2d at 1002. Once the burden shifts to the Commissioner to show that the claimant can perform other work, the grids may come into play. Id.

[18] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[19] Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987).

economy that the claimant can perform.[20] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[21] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[22]

## III. SUMMARY OF THE RECORD EVIDENCE

Plaintiff was forty six (46) years old at the time of her date last insured (DLI), September 30, 1998. (R. 394.) She has a high school education and a nursing degree. (R. 86.) She has previous work experience as a registered nurse, administrative nursing supervisor, nursing coordinator of a surgical intensive care unit, and a primary registered nurse in a surgical intensive care / open heart unit. (R. 86, 394.) Plaintiff contends that she has been unable to work since November 15, 1992 due to chronic low back pain, depression, anxiety, and memory impairment. (R. 70, 82, 152-53, 478.)

In the ALJ's review of the record, including Plaintiff's testimony, medical records from several health care providers, sworn testimony from Plaintiff's treating psychiatrist, and testimony from a vocational expert ("VE"), the ALJ determined that, prior to September 30, 1998, Plaintiff's date last insured, Plaintiff suffered from degenerative disc disease of the lumbar spine, morbid obesity, a history of surgery on the right knee, depression, and anxiety. (R. 396.) While the ALJ found these impairments to be severe,

---

[20] Wolfe v. Chater, 86 F.3d 1072, 1077-78 (11th Cir. 1996).

[21] See id.

[22] See Doughty v. Apfel, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001).

6

the ALJ determined that Plaintiff did not have an impairment or combination of impairments which met or medically equaled one of the impairments listed in Title 20, Part 404, Subpart P, Appendix 1 of the Code of Federal Regulations. (R. 396.)

The ALJ then found that, during the period of time from November 15, 1992 through June 9, 1997, Plaintiff retained the RFC to sit for six hours in an eight hour workday; stand and walk for brief periods; and lift and carry up to ten pounds with an inability to respond appropriately to usual work situations. (R. 397.) However, the ALJ further found that, as of June 10, 1997, Plaintiff had medical improvement in her impairments that was related to her ability to work. Accordingly, the ALJ determined that, beginning June 10, 1997, Plaintiff retained the RFC to lift and carry up to twenty pounds occasionally and ten pounds frequently; sit, stand, or walk for up to six hours in an eight hour workday; and to perform simple, repetitive tasks. (R. 397-98.)

As for Plaintiff's mental impairments, the ALJ found that during the period from November 15, 1992 through June 9, 1997, Plaintiff had moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, and pace; and no episodes of decompensation in work-like settings. (R. 396.) Since June 10, 1997, however, the ALJ found that Plaintiff's mental impairments have resulted in no restriction of activities of daily living; no difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, and pace; and no episodes of decompensation in work-like settings. (R. 396.)

After finding that Plaintiff could not perform her past relevant work as a registered nurse, administrative nursing supervisor, nursing coordinator of a surgical intensive care unit, or a primary registered nurse in a surgical intensive care / open heart unit "at all times relevant herein," the ALJ applied Rule 201.28 of the Medical-Vocational Guidelines (the "grids")[23] as a "framework" and found that Plaintiff was disabled during the period from November 15, 1992 through June 9, 1997. As for the time period from June 10, 2997 forward, the ALJ applied Rule 202.22 of the Medical-Vocational Guidelines and found that Plaintiff was capable of performing jobs existing in significant numbers in the national economy and thus, not disabled.

## IV. <u>DISCUSSION</u>

Plaintiff challenges the ALJ's finding that Plaintiff was "not disabled" beginning on June 10, 1997. Plaintiff argues that the ALJ committed reversible error by rejecting the vocational expert's testimony that a person with all of Plaintiff's physical and mental limitations would be unable to work and instead relying upon the grids in finding that Plaintiff was not disabled after June 10, 1997. In opposition, the Commissioner argues that the ALJ properly applied the grids to direct a finding of "not disabled" and therefore the ALJ "was not required to rely on VE testimony" at step five of the sequential analysis.

After the ALJ concluded that Plaintiff's impairments precluded her from being capable of performing her past relevant work "at all times relevant herein," the burden of proof shifted to the Commissioner to establish that Plaintiff could perform other work

---

[23] 20 C.F.R. § 404, subpt. P, app. 2.

that exists in the national economy.[24] In determining whether the Commissioner has met

this burden, the ALJ must develop a full record regarding the vocational opportunities

available to a claimant.[25] This burden may sometimes be met through exclusive reliance

on the grids when each variable on the appropriate grid accurately describes the

claimant's situation.[26] However, where a claimant has one or more non-exertional

limitations that significantly limit basic work skills,[27] exclusive reliance on the grids is not

appropriate.[28] Therefore, the Commissioner's position that the ALJ was entitled to rely

on the grids at step five of the sequential analysis depends upon whether the ALJ

properly considered Plaintiff's non-exertional limitations.

For the time period beginning on June 10, 1997, the ALJ found Plaintiff capable

of performing the exertional demands of light work,[29] subject to some mental limitations.

According to the ALJ's assessment of the impact of Plaintiff's mental impairment on her

ability to work since June 10, 1997, the ALJ found Plaintiff had no restriction of activities

---

[24] (R. 398); see Foote v. Chater, 67 F.3d 1553, 1559 (11th Cir. 1995).

[25] See Allen v. Sullivan, 880 F.2d 1200, 1201 (11th Cir. 1989).

[26] See Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987).

[27] Phillips v. Barnhart, 357 F.3d 1232, 1242 (11th Cir. 2004). Specifically, in Murray v. Heckler, the Eleventh Circuit held that "nonexertional limitations can cause the grid to be inapplicable only when the limitations are severe enough to prevent a wide range of gainful employment at a designated level." 737 F.2d 934, 935 (11th Cir. 1984).

[28] Walker v. Bowen, 826 F.2d 996, 1002-03 (11th Cir. 1987).

[29] The guidelines define light work as follows:
Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [Plaintiff] must have the ability to do substantially all of these activities.
20 C.F.R. §§ 404.1567(b); 416.967(b).

of daily living, no difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation in work-like settings. (R. 396.) As such, the ALJ limited Plaintiff to performing simple, repetitive tasks and concluded that Plaintiff retained the residual functional capacity to perform the full range of unskilled light work. (R. 401.)

Plaintiff asserts that the ALJ improperly disregarded the portion of the VE's testimony that responded to two hypotheticals incorporating functional limitations associated with Plaintiff's depression that were identified by Plaintiff's treating psychiatrist, Dr. Domingo Cerra, in his medical source statement dated May 2001, and by Rodney A. Poetter, Ph.D, a licensed psychologist, during Dr. Poetter's consultative examination of Plaintiff conducted at the Commissioner's request in September 2000. The relevant hypotheticals present, essentially verbatim, the functional limitations outlined in the medical opinions rendered by Dr. Cerra and Dr. Poetter. Specifically, the Plaintiff points to the following testimony:

> Q.  All right. Now if in addition to her physical problems, Ms. Harlow suffers an emotional condition which has been variously diagnosed, one of which was by Dr. Poetter as a depressive disorder and the last pain disorder associated with the psychological factors in having a medical condition. In looking at Dr. Poetter's report and perhaps medical source statement . . . he indicates that . . . she has only a fair[30] ability to understand and remember detailed instructions, carry out detailed instructions, maintain concentration and attention for extended periods, perform activities within a schedule, maintain regular attendance and be punctual and perform in a consistent pace and complete a normal [work] day or work week, . . . With those limitations would she be able to do these jobs that you've described?
>
> A.  No, Sir.

---

[30] Fair is defined as the individual can perform the activities satisfactorily some of the time and she has only a fair ability (R. 663.)

Q.     Would there be any other jobs that exist in the national economy that she could perform?

A.     No, Sir. I'm basing my comment on the fact that there are several areas that I've mentioned that are fair, meaning from your definition can do some of the time. She has a number of areas that I feel because of the number of the areas that are mentioned that would not allow her to keep a position sedentary, light or any other.

. . . .

A.     . . . [Y]ou mentioned approximately five areas, concentrate, attention, carry out complete detailed instructions, perform her work at a consistent pace. It sounded like you were talking at least five areas.

Q.     Right.

A.     And so with at least five of those areas . . . I feel that that would substantially reduce her ability to hold down a job.

. . . .

Q.     . . . I want to run through the same hypothetical person with regard to the physical, part of the sedentary, the light level and use Dr. [Cerra's][31] mental residual functional capacity because he's the treating psychiatrist . . . I'm just going to give you the marked [limitations]. Marked would be the ability to carry out detailed instruction, the ability to maintain concentration and attention for extended periods, the ability to perform within a schedule, maintain regular attendance and be punctual within customary tolerances, the ability to work in coordination with or in proximity to others without being distracted by them. Also without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. There's also a marked inability to get along with co-workers and peers without distracting them or exhibiting behavioral extremes and would just that part of Dr. [Cerra's] opinion not even dealing with - -

ALJ:   What Exhibit are you reading from?

ATTY:  I believe it's 46.

. . .

---

[31] The exhibit Plaintiff's counsel was reading from was the medical source statement prepared by Plaintiff's treating psychiatrist, Dr. Cerra. The transcript misspells Dr. Cerra's name as "Dr. Sierra."

        Q.      Would that part of Dr. [Cerra's] opinion not even dealing with things that are less than seriously wrong with [Plaintiff], would there be any work available in the regional or national economy which a person with this many domains showing a marked deficit?

        A.      No.

(R. 665-68.) Thus, according to the VE's testimony, the non-exertional limitations described in the hypotheticals were severe enough to significantly limit an individual's ability to perform basic work activities and would seriously erode—if not eliminate—the occupational base for light work. Because exclusive reliance on the grids is not appropriate when a claimant has non-exertional impairments that significantly limit basic work skills, and because the medical opinions of Dr. Cerra and Dr. Poetter—if fully credited—establish that Plaintiff had severe non-exertional mental impairments, the success of the Commissioner's argument depends upon whether the ALJ sufficiently explained his rationale for rejecting these medical opinions in his formulation of Plaintiff's RFC. Plaintiff argues that, when the ALJ ignored the testimony of the VE, the ALJ improperly excluded from the RFC the non-exertional limitations that had been identified by Plaintiff's long time treating psychiatrist, Dr. Cerra, and consultative examining psychologist, Dr. Poetter.

In November 1997, Dr. Cerra completed a Mental Assessment to do Work-Related Activities on Plaintiff's behalf in which he opined that Plaintiff had no useful abilities to: deal with the public, interact with supervisors, deal with work stresses, maintain attention / concentration, relate predictably in social situations, and demonstrate reliability. (R. 376-77.) He further opined that Plaintiff ranged between

being seriously limited to having no useful ability to understand, remember, and carry out complex job instructions, and behave in an emotionally stable manner. (R. 376-77.)

In May 2001, Dr. Cerra completed a Mental Residual Functional Capacity Assessment on Plaintiff's behalf in which he opined that Plaintiff had moderate[32] to marked[33] restrictions in her abilities to: remember locations and work-like procedures; understand, remember, and carry out detailed instructions; sustain an ordinary routine; complete a normal work day or work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers; and respond appropriately to changes in the work setting. (R. 523-25.) He further opined that Plaintiff had marked to extreme[34] restrictions in her abilities to: maintain attention and concentration for extended periods; and perform activities within a schedule, maintain regular attendance, and be punctual. (R. 524.) The ALJ cited several reasons for discounting these assessments of Plaintiff.

One of the reasons the ALJ found that Dr. Cerra's assessments of Plaintiff were "not persuasive" was because he considered Dr. Cerra's assessments to be "totally inconsistent" with his own progress notes. However, the specific inconsistencies cited by the ALJ are not supported by the substantial evidence.

---

[32] On this form, an individual with a "moderate" restriction was defined as having a "seriously limited" ability to function in a particular area. (R. 523.)

[33] On this form, an individual with a "marked" restriction was defined as having a "very seriously limited" ability to function in a particular area. (R. 523.)

[34] On this form, an individual with an "extreme" restriction was defined as having "no useful ability" to function in a particular area. (R. 523.)

13

For example, according to the ALJ, "mental status examinations were generally unremarkable and showed only intermittently flat affect." Contrary to this characterization of Dr. Cerra's progress notes - which span the time period from May 1994 through October 2003 and document over fifty examinations of Plaintiff - the majority of Dr. Cerra's examinations of Plaintiff document that Plaintiff demonstrated an anxious, depressed and/or constricted affect. (R. 273-74, 279-81, 283-85, 290-94, 317-19, 489-94, 498-99, 500-04, 507, 510-16, 553-58.) This longitudinal record is especially relevant because, with respect to the evaluation of a disability on the basis of a mental disorder, the regulations recognize that an individual's level of functioning may fluctuate over time. "Proper evaluation of [mental] impairment(s) must take into account any variations in the level of [an individual's] functioning in arriving at a determination of severity over time."[35] In fact, "Whenever possible, . . . a mental status examination . . . should be supplemented by other available evidence."[36]

The ALJ also relied on a progress note from September 1997 in which Dr. Cerra stated that Plaintiff was "incapable of gainful employment" despite his examination, which revealed Plaintiff was alert and oriented with constricted affect, no thought disorder, no suicidal ideation and intact memory. (R. 516.) The ALJ also pointed to Dr. Cerra's notations in January 1996 that Plaintiff "could do [a] job search," and "was ordered to get out and socialize." (R. 275-76.)

---

[35] 20 C.F.R. § 404, subpt. P, app. 1, 12.00(D)(2); *see also* <u>id.</u> at 12.00(C)(3).

[36] <u>Id.</u> at 12.00(C)(3).

While these two notes may be marginally supportive of the Commissioner's position, the ALJ took these two comments in Dr. Cerra's progress notes out of context and consider them in isolation and not in the context of Dr. Cerra's other extensive medical records. In contrast to these two comments, Plaintiff's medical records are replete with references documenting that Plaintiff had a chronic depressed mood, low energy and motivation, sleep disturbances, anxiety, inability to focus and difficulty concentrating secondary to her chronic pain and depression. (R. 273-74, 278-80, 286, 291-94, 315-18, 320, 361-81, 485-96, 499-500, 503-07, 509-17,  554-60.) Indeed, Dr. Cerra consistently noted that Plaintiff's mood, energy level, level of motivation, and ability to concentrate "paralleled the intensity of her pain." Thus, the fact that Dr. Cerra's clinical findings were occasionally benign over the course of treating Plaintiff for chronic depression, anxiety, and pain for nearly ten years does not constitute substantial evidence to support the ALJ's decision to ignore Dr. Cerra's opinion that Plaintiff experienced difficulties with concentration and depressed mood on an ongoing basis. These isolated and benign mental status examination findings merely document that Plaintiff apparently did not experience these difficulties *during highly structured* and *brief* clinical exams.[37] As recognized by the Social Security Administration's regulations, when evaluating the impact of a chronic mental impairment on an individual's capacity to work, "[t]he results of a single examination may not adequately describe [the individual's] sustained ability to function."[38]

---

[37] *See, e.g.*, id. 12.00(E) (evaluation of chronic mental impairments).

[38] 20 C.F.R. § 404, subpt. P, app. 1, 12.00(E).

With respect to Dr. Cerra's January 1996 note recommending that Plaintiff attempt to engage in a job search, this note must be viewed in the context of Dr. Cerra's progress notes overall, and Dr. Cerra's sworn testimony given in November 1997, which clearly evidence that the January 1996 notation merely documented a brief moment of improved functionality for Plaintiff. In his sworn statement, Dr. Cerra testified that he had treated Plaintiff as both her psychiatrist and as her pain management specialist for over three years and became very familiar with Plaintiff's condition in that time. (R. 360-66.) Dr. Cerra explained that his assessment of Plaintiff's functional limitations arising from her mental impairments was consistent with his experience treating her every other month for over three years. (R. 364-65.) He also explained that his progress notes were limited to the extent that the notes only documented his observations on *that particular day* and were not intended to reflect his opinion as to her condition in general. (R. 365-66.) Dr. Cerra testified that Plaintiff is chronically depressed and consistently experiences cognitive and mood disturbances secondary to the level of pain she is experiencing.

In rejecting Dr. Cerra's opinion, the ALJ also pointed to Dr. Cerra's notation that Plaintiff "was ordered to get out and socialize" in January 1996. (R. 275-76.) However, this notation highlights rather than contradicts Dr. Cerra's assessment that Plaintiff was experiencing restrictions in her ability to function socially. In subsequent progress notes, Plaintiff reported problems getting along with her neighbors, her social isolation, and examples of her poor ability to respond appropriately in normal social situations. (R. 271, 317-18, 367-68, 516-17, 553.)

16

The ALJ's failure to point to anything in Dr. Cerra's treatment notes that contradicts or conflicts with his assessment of Plaintiff is further compounded by the fact that the ALJ rejected findings that are actually well-supported by other medical evidence. In fact, contrary to the ALJ's contention that Dr. Cerra's medical opinions were "inconsistent with those of other specialists in the field of mental health," Dr. Cerra's opinions are actually substantiated by the medical opinions of consultative examining psychologists, Dr. Ernest Bordini and Dr. Ronald Poetter.

Dr. Bordini reviewed Plaintiff's medical records and examined Plaintiff in May 1994 and diagnosed her with a somatoform pain disorder, moderate to severe recurrent major depression, and a panic disorder without agoraphobia. (R. 337.) His examination of Plaintiff revealed pressured speech, and an anxious mood. Dr. Bordini observed that Plaintiff seemed to be fearful of being misunderstood and she would get highly anxious when confronted with cognitive tasks. (R. 332.) Clinical testing revealed that Plaintiff experienced high levels of anger or hostility with corresponding difficulty expressing those feelings adequately to others; marked elevation of depression, somatic concerns, and anxiety; obsessive compulsive thought patterns; hysterical tendencies; moderate paranoia; and a great deal of mistrust regarding the treatment and evaluation rendered by most of her medical health care providers. (R. 338-39.) Dr. Bordini also noted that clinical test results suggested that Plaintiff likely experienced chronic interpersonal difficulties and discomfort interacting with others. (R. 336.) Plaintiff reported loss of interest in previously pleasurable activities, low motivation, passive suicidal ideations, frequent crying spells, social withdrawal, feelings of worthlessness and that she did not

feel as though she was taken seriously by doctors. (R. 335-38.) In his functional assessment of Plaintiff, and consistent with Dr. Cerra's examination and assessments of Plaintiff, Dr. Bordini opined that Plaintiff was very seriously limited in her abilities to: maintain attention and concentration for extended periods; and complete normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and Plaintiff was seriously limited in her abilities to: carry out very short and simple or detailed instructions; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers; and respond appropriately to changes in the work setting. (R. 482-84.)

The ALJ also disregarded the opinion of Dr. Poetter. Although Dr. Poetter noted that clinical testing of Plaintiff in September 2000 revealed symptom exaggeration and magnification tendencies he, nonetheless, diagnosed Plaintiff with a severe depressive disorder, and a panic disorder associated with both psychological factors and a general medical condition. Dr. Poetter observed that Plaintiff was highly anxious, socially withdrawn and kept people at a distance. (R. 470-71.) He noted that Plaintiff's reality testing and judgment were poor. (R. 471.) Clinical testing revealed mild to moderate memory deficits. According to Dr. Poetter, Plaintiff presented with symptoms and demonstrated a level of distress that were consistent with a severe depressive disorder. (R. 470-71.) Once again, consistent with Dr. Cerra's assessment of Plaintiff, Dr. Poetter

opined that Plaintiff had "fair"[39] abilities to: understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods of time; perform activities within a schedule, maintain regular attendance, and be punctual; complete a normal work day or work week; and perform at a consistent pace. (R. 472.)

In further support of his decision not to give controlling weight to the opinion of Dr. Cerra, the ALJ also points to Plaintiff's reported activities of daily living such as an active involvement in her community and with her friends, as well as her work activity during 2002 and 2003. This finding, however, directly conflicts with Plaintiff's reported activities as documented in Dr. Cerra's treatment notes as well as Plaintiff's own testimony. For example, on three different occasions, Plaintiff reported problems she was having with interacting with members of her condominium. (R. 271. ) In May 1996, she advised that she was "being harassed by one of the residents in the condominium." (R. 271.) In his November 1997 sworn statement, Dr. Cerra advised that Plaintiff was involved in a disagreement with other members of her condominium association. According to Dr. Cerra, Plaintiff demonstrated obsessive tendencies surrounding the event and had a poor ability to interact with others. In addition, she was overly sensitive, easily overwhelmed in social situations, and had poor impulse control. (R. 366-68.) In October 2003, Plaintiff advised Dr. Cerra that she had been in a physical altercation with a neighbor. (R. 553.) Plaintiff testified that she would go out to eat with the one friend she has "once in a blue moon." (R. 580.)

---

[39] Fair was defined as "the individual can perform the activity satisfactorily some of the time." (R. 472.)

As for Plaintiff's "successful" employment in 2002 and 2003, Plaintiff's testimony clarifies the extent to which she was capable of performing the job. Plaintiff testified that she worked for her condominium association as an office assistant and that she performed clerical type duties. (R. 630-31.) However, consistent with Dr. Cerra's opinion - that her pain and depression limited her ability to perform a normal work day or work week and limited her ability to perform at a consistent pace - Plaintiff testified that she was not required to work a typical work day nor a typical forty hour work week. She testified that she would work "thirty minutes here or two hours there" for a total of only approximately fifteen hours per week. (R. 650.) In addition, she testified that she would regularly miss between two and three days per week due to pain or depression. (R. 643.) As a result, she paid people to help her do her job duties. (R. 654.) This directly supports Dr. Cerra's opinion that Plaintiff was unable to maintain regular attendance. Plaintiff made less than $1400 per month and, ultimately, she was fired for poor performance. (R. 630-31.)

Because Dr. Cerra's medical opinions must be given considerable weight unless good cause is shown to the contrary, and because Dr. Cerra's medical opinions are not contradicted by the record evidence as a whole and are consistent with his own assessments and progress notes, substantial evidence does not support the ALJ's decision to accord little, if any, weight to Dr. Cerra's opinions.

According the appropriate weight to Dr. Cerra's opinion, there is more than substantial evidence that Plaintiff has one or more severe non-exertional impairments. As such the ALJ was required to elicit and rely upon testimony from a vocational expert

to determine the extent to which the non-exertional impairments eroded the occupational base for unskilled light work. Accordingly, the Commissioner was precluded from exclusively relying on the grids at step five of the sequential analysis.

The Commissioner does not make any argument in his brief supporting the view that  the ALJ was entitled to rely on the VE's testimony. A review of the transcript and the ALJ's decision makes it very obvious why the Commissioner does not address the VE's testimony.  In order for the testimony of a VE to constitute "substantial evidence," the ALJ "must pose a hypothetical question which comprises all of the claimant's [documented] impairments.'"[40] An ALJ commits reversible error at step five if he relies on VE testimony that is unsupported by substantial evidence.[41]  The first hypothetical posed to the VE failed to address any of Plaintiff's mental limitations and as such the VE's testimony cannot constitute substantial evidence to meet the Commissioner's burden at step five of the sequential analysis.

Further compounding the error is the fact that the ALJ's conclusion itself is internally inconsistent. Contrary to the Commissioner's argument that the ALJ's reference to the VE testimony was "mere surplusage," the VE testified in response to the incomplete hypothetical that such an individual would be capable of making "a vocational adjustment to jobs existing in significant numbers in the national economy,"

---

[40] Jones v. Comm'r of Soc. Sec., 181 Fed. Appx. 767, 771 (11th Cir. 2006) (quoting Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999)).

[41] Hart v. Comm'r of Soc. Sec., No. 6:07-cv-719-ORL-DAB, 2008 WL 2686341, at *6 (M.D. Fla. June 27, 2008) (citing Pendley v. Heckler, 767 F.2d 1561, 1561 (11th Cir. 1985)).

including jobs as a blood bank credit clerk,[42] a cardiac monitor technician,[43] and a central supply clerk in a hospital setting.[44] Notably, the VE identified all three jobs as either "skilled" or "semi-skilled" light work positions which itself is in direct conflict with the ALJ's RFC determination that Plaintiff was capable of the full range of *unskilled* light work. (R. 393.)

Lastly, although the issue was not raised by the Plaintiff, the Commissioner's argument that the ALJ properly relied exclusively on the grids is not persuasive for another reason. Pursuant to an Order of the Appeals Council dated November 18, 2002, the ALJ was instructed as follows:

> Upon remand, the Administrative Law Judge will, for the pertinent period, obtain evidence from a medical expert to clarify the nature and severity of claimant's mental impairment(s). The Administrative Law Judge will also obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base. The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. . .

(R. 541-43) (citations omitted). Pursuant to section 404.977(b) of Title 20 of the Code of Federal Regulations, an ALJ is obligated to comply with Appeals Council orders. Failure to do so, when the issue is raised by the Plaintiff on appeal, constitutes reversible error.[45]

---

[42] DICTIONARY OF OCCUPATIONAL TITLES § 245.367-022 (4th ed. 1991).

[43] DICTIONARY OF OCCUPATIONAL TITLES § 078.367-010 (4th ed. 1991).

[44] (R. 663-65); DICTIONARY OF OCCUPATIONAL TITLES § 381.687-010 (4th ed. 1991).

[45] *See, e.g.*, Warren-Ward v. Astrue, No. 1:07-cv-811-TFM, 2008 WL 2397390, at *3 (M.D. Ala. June 10, 2008) (citing Sierra Club v. Martin, 168 F.3d 1, 4 (11th Cir. 1999) (holding that "courts must overturn agency actions which do not scrupulously follow the regulations and procedures promulgated by the agency itself.")).

Contrary to the Appeals Council's clear directive the ALJ chose not to enlist the help of a medical expert to interpret the medical evidence, and while the ALJ obtained the testimony of a VE, he incorrectly chose to ignore the testimony of the VE and instead relied exclusively on the grids.[46]

Accordingly, because the ALJ was precluded from relying upon the grids due to the existence of severe non-exertional impairments, the Commissioner failed to meet his burden of proving that there is "other work" that Plaintiff is capable of performing which exists in significant numbers in the national economy. Further, because Plaintiff satisfied her burden of establishing that she could not perform her past relevant work and in view of the fact that the VE testified based upon the two hypotheticals that fully described an individual of Plaintiff's age, education, work experience and limitations—both physical *and* mental— that Plaintiff would be incapable of performing work which exists in significant numbers in the national economy, Plaintiff is entitled to a judgment directing that she be awarded benefits on remand.

## V. <u>CONCLUSION</u>

In view of the foregoing, the decision of the Commissioner is **REVERSED** and **REMANDED** under sentence four of 42 U.S.C. § 405(g) with directions that on remand the Commissioner award disability benefits to Plaintiff for the period of time from June

---

[46] In addition to the fact that the ALJ should not have relied exclusively upon the grids, the Rule referenced in the ALJ's decision is completely inconsistent with Plaintiff's RFC. In finding that Plaintiff was disabled the ALJ referenced in his decision Medical-Vocational Rule 202.22. This rule, however, applies to a claimant who can perform skilled or semi-skilled work and has transferable skills. As previously discussed, the ALJ found that Plaintiff was limited to performing the full range of *unskilled* light work. As such, Rule 202.22 was not applicable.

10, 1997 to the date whenever Plaintiff's eligibility would end. The Clerk is directed to enter final judgment in favor of Plaintiff consistent with this Order and close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on March 31, 2009.

GARY R. JONES
United States Magistrate Judge

Copies to:
All Counsel